*628 Justice Thomas
delivered the opinion of the Court.
This case requires us to determine whether petitioners’ state-law tort claims for defective design and failure to warn are pre-empted by the Locomotive Inspection Act (LIA), 49 U. S. C. §20701 et seq. The United States Court of Appeals for the Third Circuit determined that petitioners’ claims fall within the field pre-empted by that Act, as that field was defined by this Court’s decision in Napier v. Atlantic Coast Line R. Co., 272 U. S. 605 (1926). We agree.
I
George Corson was employed as a welder and machinist by the Chicago, Milwaukee, St. Paul & Pacific Railroad from 1947 until 1974. Corson worked in locomotive repair and maintenance facilities, where his duties included installing brakeshoes on locomotives and stripping insulation from locomotive boilers. In 2005, Corson was diagnosed with ma­lignant mesothelioma.
In 2007, Corson and his wife filed suit in Pennsylvania state court against 59 defendants, including respondents Railroad Friction Products Corporation (RFPC) and Viad Corp (Viad). According to the complaint, RFPC distributed locomotive brakeshoes containing asbestos, and Viad was the successor-in-interest to a company that manufactured and sold locomotives and locomotive engine valves containing as­bestos. Corson alleged that he handled this equipment and that he was injured by exposure to asbestos. The complaint *629 asserted state-law claims that the equipment was defectively designed because it contained asbestos, and that respondents failed to warn of the dangers of asbestos or to provide in­structions regarding its safe use. After the complaint was filed, Corson passed away, and the executrix of his estate, Gloria Kurns, was substituted as a party. Corson’s widow and the executrix are petitioners here.
Respondents removed the case to the United States Dis­trict Court for the Eastern District of Pennsylvania and moved for summary judgment. Respondents argued that petitioners’ state-law claims were pre-empted by the LIA. The District Court agreed and granted summary judgment for respondents. See Kurns v. A. W. Chesterton, Civ. Action No. 08-2216 (ED Pa., Feb. 3, 2009), App. to Pet. for Cert. 39a. The Third Circuit affirmed. See Kurns v. A. W. Ches­terton Inc., 620 F. 3d 392 (2010). We granted certiorari. 563 U. S. 1032 (2011).
II
Congress enacted the predecessor to the LIA, the Boiler Inspection Act (BIA), in 1911. The BIA made it unlawful to use a steam locomotive “unless the boiler of said locomo­tive and appurtenances thereof are in proper condition and safe to operate ... without unnecessary peril to life or limb.” Act of Feb. 17, 1911, ch. 103, §2, 36 Stat. 913-914. In 1915, Congress amended the BIA to apply to “the entire locomo­tive and tender and all parts and appurtenances thereof.”[1] Act of Mar. 4, 1915, ch. 169, § 1, 38 Stat. 1192. The BIA as amended became commonly known as the Locomotive In­spection Act. As relevant here, the LIA provides:
“A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances—
*630 “(1) are in proper condition and safe to operate without unnecessary danger of personal injury;
“(2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and
“(3) can withstand every test prescribed by the Sec­retary under this chapter.” 49 U. S. C. §20701.[2]
The issue presented in this case is whether the LIA pre­empts petitioners’ state-law claims that respondents defec­tively designed locomotive parts and failed to warn Corson of dangers associated with those parts. In light of this Court’s prior decision in Napier, supra, we conclude that petitioners’ claims are pre-empted.
Ill
A
The Supremacy Clause provides that federal law “shall be the supreme Law of the Land .. . any Thing in the Constitu­tion or Laws of any state to the Contrary notwithstanding.” U. S. Const., Art. VI, cl. 2. Pre-emption of state law thus occurs through the “direct operation of the Supremacy Clause.” Brown v. Hotel Employees, 468 U. S. 491, 501 (1984). Congress may, of course, expressly pre-empt state law, but “[e]ven without an express provision for preemption, we have found that state law must yield to a congressional Act in at least two circumstances.” Crosby v. National For­eign Trade Council, 530 U. S. 363, 372 (2000). First, “state law is naturally preempted to the extent of any conflict with a federal statute.” Ibid. Second, we have deemed state law pre-empted “when the scope of a [federal] statute indi­cates that Congress intended federal law to occupy a field exclusively.” Freightliner Corp. v. Myrick, 514 U. S. 280, *631 287 (1995). We deal here only with the latter, so-called field pre-emption.
B
We do not, however, address the LIA’s pre-emptive effect on a clean slate, because this Court addressed that issue 85 years ago in Napier. In that case, railroads challenged two state laws that “prohibited] use within the State of locomo­tives not equipped with” certain prescribed devices, on the ground that the Interstate Commerce Commission (ICC), the agency then vested with the authority to carry out the LIA’s requirements, had not required the devices in question.[3] 272 U. S., at 607, 609. In response, the States argued that their requirements were not pre-empted because they were directed at a different objective than the LIA. Id., at 612. According to the States, their regulations were intended to protect railroad workers from sickness and disease, whereas “the federal regulation endeavors solely to prevent acciden­tal injury in the operation of trains.” Ibid.
To determine whether the state requirements were pre­empted, this Court asked whether the LIA “manifest[s] the intention to occupy the entire field of regulating locomotive equipment.” Id., at 611. The Court answered that ques­tion in the affirmative, stating that “[t]he broad scope of the authority conferred upon the [ICC]” by Congress in the LIA led to that conclusion. Id., at 613. The power delegated to the ICC, the Court explained, was a “general one” that “ex­tends to the design, the construction and the material of every part of the locomotive and tender and of all appurte­nances.” Id., at 611.
The Court rejected the States’ contention that the scope of the pre-empted field was to “be determined by the object sought through the legislation, rather than the physical ele­ *632 ments affected by it.” Id., at 612. The Court found it dis-­positive that “[t]he federal and the state statutes are directed to the same subject — the equipment of locomotives.” Ibid. Because the States’ requirements operated upon the same physical elements as the LIA, the Court held that the state laws, “however commendable or however different their pur­pose,” id., at 613, fell within the LIA’s pre-empted field.
> i — I
Against the backdrop of Napier, petitioners advance two arguments in support of their position that their state-law claims related to the use of asbestos in locomotive equipment do not fall within the LIA’s pre-empted field. Petitioners first contend that Napier no longer defines the scope of the LIA’s pre-empted field because that field has been narrowed by a subsequently enacted federal statute. Alternatively, petitioners argue that their claims do not fall within the LIA’s pre-empted field, even as that field was defined by Na­pier. We address each of petitioners’ arguments in turn.
A
First, petitioners suggest that the Federal Railroad Safety Act of 1970 (FRSA), 84 Stat. 971 (codified at 49 U. S. C. §20102 et seq.), altered the LIA’s pre-emptive scope. The FRSA grants the Secretary of Transportation broad regula­tory authority over railroad safety. See § 20103(a). Peti­tioners point to the FRSA’s pre-emption provision, which provides in part that “[a] State may adopt or continue in force a law, regulation, or order related to railroad safety ... until the Secretary of Transportation ... prescribes a regula­tion or issues an order covering the subject matter of the State requirement.” § 20106(a)(2) (2006 ed., Supp. IV). Ac­cording to petitioners, the FRSA’s pre-emption provision supplanted the LIA’s pre-emption of the field, with the result that petitioners’ claims are not pre-empted because the Sec­retary has not issued a regulation or order addressing the use of asbestos in locomotives or locomotive parts.
*633 Petitioners’ reliance on the FRSA is misplaced. The FRSA instructs that “[t]he Secretary of Transportation, as necessary, shall prescribe regulations and issue orders for every area of railroad safety supplementing laws and regu­lations in effect on October 16, 1970.” § 20103(a) (2006 ed.) (emphasis added). By its terms, the FRSA does not alter pre-existing federal statutes on railroad safety. “Rather, it leaves existing statutes intact,... and authorizes the Secre­tary to fill interstitial areas of railroad safety with sup­plemental regulation.” Marshall v. Burlington Northern, Inc., 720 F. 2d 1149, 1152-1153 (CA9 1983) (Kennedy, J.). Because the LIA was already in effect when the FRSA was enacted, we conclude that the FRSA left the LIA, and its pre-emptive scope as defined by Napier, intact.
B
Since the LIA’s pre-emptive scope remains unaltered, peti­tioners must contend with Napier. Petitioners do not ask us to overrule Napier and thus do not seek to overcome the presumption of stare decisis that attaches to this 85-year-old precedent. See Global-Tech Appliances, Inc. v. SEB S. A., 563 U. S. 754, 765 (2011) (noting the “special force of the doctrine of stare decisis with regard to questions of statu­tory interpretation” (internal quotation marks omitted)). Instead, petitioners advance several arguments aimed at demonstrating that their claims fall outside of the field pre­empted by the LIA, as it was defined in Napier. Each is unpersuasive.
1
Petitioners, along with the Solicitor General as amicus cu­riae, first argue that petitioners’ claims do not fall within the LIA’s pre-empted field because the claims arise out of the repair and maintenance of locomotives, rather than the use of locomotives on a railroad line. Specifically, they contend that the scope of the field pre-empted by the LIA is coexten­sive with the scope of the Federal Government’s regulatory *634 authority under the LIA, which, they argue, does not extend to the regulation of hazards arising from the repair or main­tenance of locomotives. Therefore, the argument goes, state-law claims arising from repair or maintenance — as op­posed to claims arising from use on the line — do not fall within the pre-empted field.
We reject this attempt to redefine the pre-empted field. In Napier, the Court held that Congress, in enacting the LIA, “manifested] the intention to occupy the entire field of regulating locomotive equipment,” and the Court did not distinguish between hazards arising from repair and mainte­nance as opposed to those arising from use on the line. 272 U. S., at 611. The pre-empted field as defined by Napier plainly encompasses the claims at issue here. Petitioners’ common-law claims for defective design and failure to warn are aimed at the equipment of locomotives. Because those claims “are directed to the same subject” as the LIA, Na­pier dictates that they fall within the pre-empted field. Id., at 612.
2
Petitioners farther argue that, even if their design-defect claims are pre-empted, their failure-to-warn claims do not suffer the same fate. In their complaint, petitioners alleged in closely related claims (1) that respondents negligently failed to warn of the risks associated with asbestos and to provide instructions concerning safeguards for working with asbestos; and (2) that the asbestos-containing products were defective because respondents failed to give sufficient warn­ings or instructions concerning the “risks, dangers, and harm inherent in said asbestos products.” See App. 20-27 (¶¶7-­10, 12), 42 (¶8); see also Brief for Petitioners 11. According to petitioners, these claims do not fall within the LIA’s pre­empted field because “[t]he basis of liability for failure to warn ... is not the ‘design’ or ‘manufacture’ of a product,” but is instead “the failure to provide adequate warnings re­garding the product’s risks.” Reply Brief for Petitioners 16.
*635 .We disagree. A failure-to-warn claim alleges that the product itself is unlawfully dangerous unless accompanied by sufficient warnings or instructions. Restatement (Third) of Torts: Products Liability § 2(c) (1997) (A failure-to-warn claim alleges that a product is defective “when the foresee­able risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instruc­tions or warnings by the seller or other distributor, . . . and the omission of the instructions or warnings renders the product not reasonably safe”); see also id., Comment l, at 33 (“Reasonable designs and instructions or warnings both play important roles in the production and distribution of reason­ably safe products”). Thus, the “gravamen” of petitioners’ failure-to-warn claims “is still that [Corson] suffered harmful consequences as a result of his exposure to asbestos con­tained in locomotive parts and appurtenances.” 620 F. 3d, at 398, n. 8. Because petitioners’ failure-to-warn claims are therefore directed at the equipment of locomotives, they fall within the pre-empted field defined by Napier. 272 U. S., at 612.[4]
3
Petitioners also contend that their state-law claims against manufacturers of locomotives and locomotive parts fall out­side of the LIA’s pre-empted field because manufacturers were not regulated under the LIA at the time that Corson *636 was allegedly exposed to asbestos. Petitioners point out that the LIA, as originally enacted in the BIA, subjected only common carriers to civil penalties. Act of Feb. 17,1911, § 9, 36 Stat. 916. It was not until 1988, well after the events of this case, that the LIA’s penalty provision was revised to apply to “[a]ny person” violating the LIA. Rail Safety Improvement Act of 1988, § 14(7)(A), 102 Stat. 633; see also §14(7)(B) (amending penalty provision to provide that “an act by an individual that causes a railroad to be in violation . . . shall be deemed a violation”).
This argument fails for the same reason as the two pre­ceding arguments: It is inconsistent with Napier. Napier defined the field pre-empted by the LIA on the basis of the physical elements regulated — “the equipment of locomotives” — not on the basis of the entity directly subject to regulation. 272 U. S., at 612. Because petitioners’ claims are directed at the equipment of locomotives, they fall within the pre-empted field.
Petitioners’ proposed rule is also contrary to common sense. Under petitioners’ approach, a State could not re­quire railroads to equip their locomotives with parts meet­ing state-imposed specifications, but could require manufac­turers of locomotive parts to produce only parts meeting those state-imposed specifications. We rejected a similar approach in an express pre-emption context in Engine Mfrs. Assn. v. South Coast Air Quality Management Dish, 541 U. S. 246 (2004). There, a state entity argued that its rules prohibiting the purchase or lease of vehicles that failed to meet stringent emissions requirements were not pre-empted by the Clean Air Act, 42 U. S. C. § 7543(a), because the rules in question were aimed at the purchase of vehicles, rather than their manufacture or sale. 541 U. S., at 248. We ob­served, however, that “treating sales restrictions and pur­chase restrictions differently for pre-emption purposes would make no sense,” because the “manufacturer’s right to sell federally approved vehicles is meaningless in the ab­ *637 sence of a purchaser’s right to buy them.” Id., at 255. Sim­ilarly, a railroad’s ability to equip its fleet of locomotives in compliance with federal standards is meaningless if manufac­turers are not allowed to produce locomotives and locomotive parts that meet those standards. Petitioners’ claims thus do not avoid pre-emption simply because they are aimed at the manufacturers of locomotives and locomotive parts.
4
Finally, petitioners contend that the LIA’s pre-emptive scope does not extend to state common-law claims, as op­posed to state legislation or regulation. Petitioners note that “a preempted field does not necessarily include state common law.” Brief for Petitioners 38-39 (citing Silkwood v. Kerr-McGee Corp., 464 U. S. 238 (1984); Sprietsma v. Mer­cury Marine, 537 U. S. 51 (2002)). Napier, however, held that the LIA “occupied] the entire field of regulating loco­motive equipment” to the exclusion of state regulation. 272 U. S., at 611-612. That categorical conclusion admits of no exception for state common-law duties and standards of care. As we have recognized, state “regulation can be . . . effec­tively exerted through an award of damages,” and “[t]he obli­gation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling pol­icy.” San Diego Building Trades Council v. Garmon, 359 U. S. 236, 247 (1959). Cf. Riegel v. Medtronic, Inc., 552 U. S. 312, 324 (2008) (“Absent other indication, reference to a State’s ‘requirements’ [in a federal express pre-emption provision] includes its common-law duties”). We therefore conclude that state common-law duties and standards of care directed to the subject of locomotive equipment are pre­empted by the LIA.
* * *
For the foregoing reasons, we hold that petitioners’ state-­law design-defect and failure-to-warn claims fall within the field of locomotive equipment regulation pre-empted by the *638 LIA, as that field was defined in Napier. Accordingly, the judgment of the Court of Appeals is affirmed.

It is so ordered.

 A “tender” is “[a] car attached to a locomotive, for carrying a supply of fuel and water.” Webster’s New International Dictionary of the English Language 2126 (1913).

 At the time of Corson’s employment, this provision of the LIA was worded somewhat differently. See 45 U. S. C. § 23 (1946 ed.). Petitioners do not argue that the change in statutory language makes any difference in this case.

 Act of Feb. 17, 1911, §6, 36 Stat. 915. That authority has since been transferred to the Secretary of Transportation. Department of Transpor­tation Act, §§ 6(e)(1)(E) and (F), 80 Stat. 939; see 49 U.S.C. §§20701-­20702.

 Justice Sotomayor apparently agrees that petitioners’ failure-to-­warn claims are directed at the equipment of locomotives. Post, at 644 (opinion concurring in part and dissenting in part). Yet, she argues, those claims affect locomotive equipment only “ ‘tangentially.’ ” Ibid, (quoting English v. General Elec. Co., 496 U. S. 72, 85 (1990)). Not so. A failure-­to-warn claim imposes liability on a particular design of locomotive equip­ment unless warnings deemed sufficient under state law are given. This duty to warn and the accompanying threat of liability will inevitably in­fluence a manufacturer’s choice whether to use that particular design. By influencing design decisions in that manner, failure-to-warn liability has a “ ‘direct and substantial effect’ ” on the “physical equipment” of a locomo­tive. Post, at 644 (quoting English, supra, at 85).